Anthony D. **WHEELER,** Appellant

v.

**UNITED STATES,** Appellee.

Nos. 01–CF–271, 01–CF–387.

District of Columbia Court of Appeals.

Argued March 22, 2005.

Decided Aug. 16, 2007.

Jennifer C. Daskal, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Rochelle E. Rubin, Assistant United States Attorney, for appellee. Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, Barbara J. Valliere, and Burke W. Kappler, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, Associate Judge, and KING and TERRY,* Senior Judges.

RUIZ, Associate Judge:

Appellant challenges his conviction on a number of weapons charges, claiming several errors in the instructions given to the jury concerning fingerprint evidence. We hold that an instruction to the jury that the lack of fingerprint evidence cannot, as a matter of law, constitute reasonable doubt impermissibly invaded the jury's exclusive province to weigh the evidence as a whole against the standard of reasonable doubt, and requires reversal even under the high standard for plain error review. We also agree that the instruction that the police had "no duty" to collect fingerprint evidence should not have been given in this case. We, therefore, reverse appellant's conviction on the weapons charges, and remand the case to the trial court.[1]

## I.

On August 27, 1997, members of the Metropolitan Police Department (MPD)

---

* Judge Terry was an Associate Judge of the court at the time this case was argued. His status changed to Senior Judge on February 1, 2006.

1. Appellant was also convicted of violating the Bail Reform Act, D.C.Code § 23–1327(a), for which he received a sentence of one to

three years. Separate notices of appeal were filed regarding appellant's convictions on firearms charges (No. 01–CF–387) and his conviction for having violated the Bail Reform Act (No. 01–CF–271). However, the briefs are silent on the latter. Therefore, we consider that appellant has abandoned the appeal from his conviction for having violated the

received an anonymous tip that someone in the vicinity of 6315 Georgia Avenue was in possession of a firearm. The anonymous tipster did not describe the person he claimed to have a gun, but said that the person was near a red four-by-four truck. As MPD officers responded, they discovered that the address corresponded to a carwash, and when they arrived, saw appellant within arm's reach of an unoccupied red truck that was coming out of the carwash with the engine running and the doors locked. One officer testified that when he first saw appellant, he had his hand on the truck and "some type of object wrapped in a cloth or some type of rag." The officer looked away while he parked the police cruiser, and when he again saw appellant, he no longer had an object in his hand, and was walking away from the truck. Another officer, however, testified that she did not see appellant holding a wrapped object in his hand nor did she see him actually touching the truck. A third officer testified that he saw appellant pull back his hand from near the truck, and then walk away, but did not see an object in his hand.

Appellant was initially frisked for weapons, and this search did not reveal any contraband. When asked whether the truck was his, appellant twice said that it was not. When the officer said that the truck would be ticketed and towed, however, appellant admitted that it did indeed belong to him. As the officers went into the carwash office to speak with employees there, appellant tried to run from the premises. He was apprehended, handcuffed, and placed in a police car.

Because the doors of the truck were locked, the officers called for a supervisor. When the supervisor arrived, he peered through the heavily tinted windows of appellant's truck, and saw a gun in the car; two other officers who looked in also saw a gun. The police contacted appellant's mother, the registered owner of the truck. When she arrived and unlocked the truck, the officers seized a semi-automatic gun (a Mach 11) that was in plain sight on the driver's side of the armrest of the front seat. The gun was loaded, and later determined to be operable. Police dusted the weapon, magazine, and bullets, but were unable to recover any fingerprints.

At trial, appellant presented the testimony of two employees of the carwash who stated that he was a regular customer. They explained the routine followed at the carwash, and both employees testified that although they had cleaned and driven the truck immediately before the police arrived, they did not see a weapon in the vehicle. Appellant also testified on his own behalf. He explained that he had taken the truck to be washed, but that when the truck was initially returned to him it was still dirty, and he summoned an employee to complain. That employee, according to appellant, got into the truck and backed it into the area where it was parked when the police arrived. After making a phone call, appellant looked around for this employee, but was unable to find him. Appellant testified that, as

Bail Reform Act. *See D.D. v. M.T.,* 550 A.2d 37, 48 (D.C.1988) ("Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal.") (quoting *Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)). Because the challenged instructions relate only to the weapons charges, our reversal of appellant's conviction on those charges is immaterial to the validity of appellant's conviction for having violated the Bail Reform Act, as "[a] conviction of the underlying offense is neither an element of, nor a condition precedent to, a conviction under § 23–1327." *See Williams v. United States,* 331 A.2d 341, 342 (D.C.1975).

the police arrived, he was talking to some acquaintances who were in a blue truck. He did not respond to the police inquiries as to who owned "the truck," because he was unsure of what truck—the blue one or the red one—they were referring to. He also denied any connection to the gun found in his vehicle. During cross-examination appellant was impeached with the fact that he had provided a false name to the police during the booking process. In rebuttal, the government also called into question appellant's testimony by recalling one of the arresting officers, who testified that when he approached appellant there was no blue truck in the vicinity, nor was the appellant talking to anyone.

Thus, what was presented to the jury was a circumstantial case that appellant possessed the firearm found in the truck he had driven to the carwash. The government's theory was that appellant had been holding the gun, wrapped in a rag, when the police car arrived, but that appellant disposed of the gun by placing it in the truck before the police officer approached him. The defense established that several other persons had access to the truck after appellant surrendered control to the carwash employees, who testified that there was no gun in the vehicle at that time. There was no physical evidence, such as fingerprints, which linked appellant to the gun found in his car.

The government requested, and the trial judge gave, the following instruction to the jurors:

> There has been some testimony regarding the failure of the police to retrieve fingerprints from the evidence in this case. As to this evidence, you are instructed that the Government is under

no duty to conduct fingerprint tests. Second, the government is not required to negate all possible inferences of innocence before one can be found guilty of an offense beyond a reasonable doubt. In that regard, the absence of any fingerprint evidence, standing alone, does not constitute reasonable doubt as to the firearm charges here.

Defense counsel objected to the second sentence of the instruction, arguing that it was irrelevant as the police *had* tried to obtain fingerprint evidence. The trial judge rejected this argument, ruling that the instruction was "an accurate statement of the law." Counsel for appellant further argued that "I don't know that it is correct to suggest that it's a statement of the law. I mean, there is no law that says they have to or don't have to, so how could it be a statement of the law?" The judge replied that the instruction was supported by the cases cited by the government.[2]

The jury returned guilty verdicts on all the weapons charges: Carrying a Pistol Without a License (CPWL), in violation of D.C.Code § 22–3204(a);[3] Possession of an Unregistered Firearm (UF), in violation of D.C.Code § 6–2311(a); Unlawful Possession of Ammunition (UA), in violation of D.C.Code § 6–2361(3). This timely appeal ensued.

Before this court, appellant renews his challenge to the "no duty" instruction. He also argues, for the first time on appeal, that the third and fourth sentences of the instruction impermissibly encroached on the jury's province as sole finder of fact, in violation of his right to a jury trial under the Sixth Amendment, and misdescribed the reasonable doubt standard, in violation

---

2. The government relied on *Williams v. United States*, 237 A.2d 539, 541 (D.C.1968), and *Banks v. United States*, 287 A.2d 85, 87 (D.C. 1972).

3. Unless otherwise noted, references to the D.C.Code are to the 1981 version.

of his Fifth Amendment due process rights.

## II.

### The "No Duty" Instruction

▮ In reviewing a challenge to a jury instruction that was preserved at trial, the central question for this court is whether it is an adequate statement of the law, and whether it is supported by evidence in the case. *See Leftwitch v. United States,* 251 A.2d 646, 649 (D.C.1969); *Spade v. United States,* 277 A.2d 654, 656 (D.C.1971). This court reviews the trial court's decision to give a requested jury instruction for abuse of discretion, viewing the instructions as a whole. *See Edwards v. United States,* 721 A.2d 938, 944 (D.C. 1998).

In its instructions to the jury, the court stated that "[t]here has been some testimony regarding the failure of the police to retrieve fingerprints from the evidence in this case. As to this evidence, you are instructed that the Government is under no duty to conduct fingerprint tests." Appellant's challenge to this instruction is twofold. First, he contends that the "no duty" instruction was irrelevant on the facts of this case, as there was evidence that the police had dusted the gun, magazine, and bullets found in the truck. Moreover, he argues that it misstated the law, because an internal regulation, MPD General Order 304.8(I)(E)(1) (Feb 24, 1991), required officers to "request a latent fingerprint examination in those case[s] where, through investigation or information from a reliable source, they have developed a suspect to a particular crime or series of crimes."

▮ Recent cases involving the "no duty" instruction, and its use in this case, suggest that we should take the opportunity to discuss it in a comprehensive manner.

The purpose of the "no duty" instruction is to counter an inference that evidence that could have been—but was not—collected and presented to the jury would have undermined the government's case or been favorable to the defense. *See Greer v. United States,* 697 A.2d 1207, 1211–12 (D.C.1997). Conceptually, it is the opposite of a missing evidence instruction. *Cf. Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893) ("[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."). As we have explained, the "no duty" instruction is given not because the defense argument about the absence of fingerprint evidence is improper, but, to the contrary, because the defense is always free to comment on the absence of evidence in arguing to the jury that the government has not met its burden to prove guilt beyond a reasonable doubt. *See (Henry) Brown v. United States,* 881 A.2d 586, 594 (D.C.2005) (citing *Smith v. United States,* 709 A.2d 78, 82 (D.C.1998) (en banc)). Thus, where the defense argues to the jury that it should draw an inference against the government from its failure to gather certain evidence, the government *may* be entitled to an instruction that informs the jury that it was under no duty to collect the evidence. The government is not, however, automatically entitled to such an instruction in every case and as a matter of course.

▮ For the instruction to be relevant to the case, there must have been evidence that the police failed to gather available evidence or defense argument to that effect. *See id.* at 594 (noting that instruction not warranted because defense counsel merely argued about the sufficiency of the evidence, without castigating the gov-

ernment for not having fulfilled its obligation). Here, for example, the police did attempt to gather fingerprint evidence, and although they were unsuccessful in doing so, there was no suggestion that it was because of negligence on their part. An instruction that the police were under no duty to collect fingerprint evidence in this circumstance does not serve its intended purpose to counter an inference that the police were derelict in conducting their investigation. Without an anchor in the evidence or defense argument that the instruction is intended to counter, the "no duty" instruction runs the risk of confusing the jury by seeming to contradict the admonition in the reasonable doubt instruction we have carefully constructed that "[r]easonable doubt, as the name implies, is a doubt based upon reason—a doubt for which you have a reason based upon the evidence *or the lack of evidence in the case.*" *Smith,* 709 A.2d at 82 (emphasis added).

■■■ As with any instruction, the caution that the government is not legally obligated to gather and produce fingerprint evidence must have a foundation either in law or on evidence. *See Brown,* 881 A.2d at 594. Because the "no duty" instruction seeks to inform the jury about the investigative duties imposed by law on the police, it must be founded in law, and it is the burden of the party requesting an instruction to lay a foundation for it. *See id.* "It is well settled that the Due Process obligation to preserve and disclose exculpatory evidence does not impose on the government an affirmative duty to collect fingerprint evidence." *Id.* at 594 n. 11 (citing cases). This is the premise underlying the general application of the "no duty" instruction, and it is correct in those cases in which no specific challenge is made to its application in a particular case. But simply because the Constitution does not impose an affirmative duty to develop fingerprint evidence does not mean that there could not be other sources that impose a duty on the police, such as statutes or regulations. Thus, if there is a specific foundational challenge to the "no duty" instruction, the government is required to explain that the police were under no legal duty to collect the evidence before the trial judge so instructs the jury.

■■■ Turning to this case, there was no evidence that the police did not try to collect fingerprint evidence—to the contrary, there was evidence that they did— and defense counsel did not misleadingly argue to the jury that it should draw a negative inference from the police's failure to collect and present fingerprint evidence. Therefore, there was no need for an instruction to counter an unfounded inference. Appellant objected generally in the trial court that the "no duty" instruction misstated the law, but did not explain why it was incorrect. In overruling that objection, the trial court relied upon cases which state that there is no obligation imposed by the Due Process clause to gather available evidence. See *supra,* note 1; *see also Brown,* 881 A.2d at 594 n. 11. Appellant's argument in this court is more specific: that MPD General Order 304.8(I) imposes upon the police an obligation to "request a latent fingerprint examination" in cases where there is a suspect, and that the investigation in this case fell in that category because the police had identified appellant as a suspect at the carwash. Had appellant made that argument in the trial court, it would have been the government's burden to satisfy the trial court that the MPD regulations (or any other law) did not impose a duty on the police in this case as a necessary foundation for the no duty instruction. We do not need to address the validity or applicability of the MPD General Order to the investigation in this

case, nor do we need to consider whether the "no duty" instruction by itself so prejudiced appellant as to require reversal because, as we discuss in the next section, we reverse the weapons conviction on the basis of another but, on the facts of this case, closely related erroneous instruction.[4]

## III.

### Absence of Fingerprint Evidence and Reasonable Doubt

#### A. *The Challenge to the Instruction*

Appellant's main challenge is to the instruction that informed the jury that "the absence of any fingerprint evidence, standing alone, does not constitute reasonable doubt as to the firearm charges here." He argues, first, that the judge imposed her view of what was or was not reasonable doubt on the jury, thereby violating his Sixth Amendment right to have a fair and impartial jury determination of all facts essential to establishing guilt. Second, appellant contends that this instruction, when coupled with the instructions advising the jury that the government had no duty to collect fingerprint evidence and did not need to "negate all possible inferences of innocence," was at odds with the reasonable doubt instruction. Specifically, he argues that they had the effect of lowering the government's burden of proof beyond a reasonable doubt—thereby depriving him of his right under the Due Process Clause of the Fifth Amendment to be convicted only on proof beyond a reasonable doubt.

 Appellant objected solely to the "no duty" instruction (the first two of the four sentences in the instruction he challenges on appeal, discussed *supra*), and no objection was made to the last two of the four sentences in the instruction. Objection to one portion, of an instruction does not suffice to preserve an objection to another. *See* 1 KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS § 7.04 (5th ed. 2000) ("[A]n instruction cannot be objected to on one ground in the trial court and attacked in the appellate court on a different ground, nor will an objection to one portion of the charge permit a party to assert error on appeal on a different part of the charge.") (collecting cases). Superior Court Criminal Rule 30 provides that, "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Super. Ct.Crim. R. 30. "The obvious reason for requiring that objections to instructions be made before the jury retires is to afford the trial court an opportunity to correct any instructional defect and thereby avoid error which otherwise might necessitate a new trial." *Watts v. United States,* 362 A.2d 706, 708 (D.C.1976) (en banc). If a party fails to raise a timely objection at trial, our review is limited to plain error. *See Green v. United States,* 718 A.2d 1042, 1056 (D.C. 1998) (citing *Robinson v. United States,* 649 A.2d 584, 586 (D.C.1994)).

Appellant maintains that application of the plain error standard is unwarranted here because at trial he objected on the ground that the instruction overall was

---

4. We note that if the government elects to retry appellant and seeks a "no duty" instruction at the retrial, appellant will be free to present the MPD regulations, and the government will have the burden to lay a proper foundation for the instruction. The trial court would then need to evaluate whether the instruction is supported by the evidence and argument in the case, and determine whether the regulations did, in the context of the facts of the investigation in this case, impose a duty on the police's conduct of their investigation.

"not a correct statement of law." He claims that although he did not articulate his objection as extensively as he has in this appeal, the court was sufficiently on notice that the instruction was legally deficient. But not any objection will suffice to ensure plenary appellate review. Because "the purpose of Rule 30 is 'to give the trial court the opportunity to correct errors [in] and omissions' from the charge to the jury," *Green*, 718 A.2d at 1056 (quoting (*Linwood) Johnson v. United States*, 387 A.2d 1084, 1089 (D.C.1978) (en banc)), the rule "requires a distinct statement of what was wrong with the instruction and a precise explanation of the grounds for the objection." *Id.*; *see also (Joyce) Johnson v. United States*, 520 U.S. 461, 465, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) ("This Rule [30] is simply the embodiment of the 'familiar' principle that a right 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'") (quoting *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). This is in keeping with our policy of having arguments presented first to the trial court, so that "the trial judge is given the opportunity to consider and decide the question presented." *(James) Brown v. United States*, 726 A.2d 149, 154 (D.C. 1999).

■ We recognize that trial counsel may not have had the time to reflect and articulate an objection during the press of an ongoing trial that appellate counsel is afforded in preparing a brief on appeal. Given the requirement of a "distinct" objection, however, defense counsel's generic assertion at trial that the instruction misstated the law because "there is no law that says they have to or don't have to" collect fingerprint evidence, without more, was too imprecise to put the court on notice of the claimed error. *See Dotson v. Scotty's Contracting, Inc.*, 86 F.3d 613, 616 (6th Cir.1996) ("A global objection of the sort offered here—an objection, on unspecified grounds, to everything in the charge other than what had been proposed by the objecting party—is hardly an objection 'stating distinctly the matter objected to and the grounds of the objection.'"); O'MALLEY, at § 7.04 (collecting cases). Therefore, this claim of instructional error is subject to plain error review.

### B. *Plain Error Review*

■ Although Rule 30 requires the defendant to lodge an objection to jury instructions with the trial court to avoid forfeiture of a claim of instructional error, Rule 52(b) ameliorates the absolute language of that provision, with the caveat that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the Court." Super. Ct.Crim. R. 52(b); [5] *see* D.C.Code § 11–721(e) ("On the hearing of any appeal in any case, the District of Columbia Court of Appeals shall give judg-

---

**5.** Superior Court Criminal Rule 52(b) is identical to its Federal analogue. Although it initially seems odd that the scope of our review is delineated by a Superior Court rule, the Advisory Committee note to the Federal Rule makes clear that the rule is merely a codification of existing case law, as well as then-existing statutes and rules so confining appellate review. *See Olano*, 507 U.S. at 731, 113 S.Ct. 1770 ("The Rule has remained unchanged since the original version of the Criminal Rules, and was intended as 'a restatement of existing law.'"). It has therefore become well accepted that this rule, which pertains to trial courts, also delineates the scope of appellate review. *See id.*; 3A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 851 (2d ed. 1982) ("Rule 52, describing how courts are to treat various kinds of errors, applies to both the trial court and the appellate courts.").

ment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."). The Supreme Court has delineated a two-step process which is to be employed in identifying which errors, though unobjected to at trial, will qualify for appellate relief. A "plain error" is identified by three qualities: first, there must be an error; second, this error must be plain in the sense that it must be obvious to the trial judge; and third, the error must affect substantial rights. *See Olano*, 507 U.S. at 732–34, 113 S.Ct. 1770. Once these three factors are present, an appellate court may exercise its discretion to take notice of the error, even though it was not preserved before the trial court. *See id.* at 735–36, 113 S.Ct. 1770. "[R]eversal for plain error ... should be confined to 'particularly egregious' situations," *Dixon v. United States*, 565 A.2d 72, 75 (D.C. 1989) (quoting *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)), and is limited to where the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736, 113 S.Ct. 1770 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)); *see (Joyce) Johnson*, 520 U.S. at 469–70, 117 S.Ct. 1544 ("When the first three parts of *Olano* are satisfied, an appellate court must then determine whether the forfeited error 'seriously affects the fairness integrity or public reputation of judicial proceedings' before it may exercise its discretion to correct the error." (quoting *Olano*, 507 U.S. at 736, 113 S.Ct. 1770).)

To make clear, as the Supreme Court counseled in *Olano*, "waiver is different from forfeiture." *Olano*, 507 U.S. at 733, 113 S.Ct. 1770. Thus, while our discussion considers whether appellant has forfeited

review of this issue by failing to lodge an objection below, it is clear that he did not waive—*i.e.*, he did not make an "intentional relinquishment or abandonment of a known right," *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)—his right to have his guilt adjudicated by a jury, without interference by the trial judge into matters entrusted solely to that jury's prerogative.

■ Though deferential and confined, review for plain error nevertheless may require appellate intervention in certain cases. "Our need to encourage all trial participants to seek a fair and accurate trial the first time around," must be balanced "against our insistence that obvious injustice be promptly redressed." *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Therefore, even though "not properly raised, yet if a plain error was committed in a matter so absolutely vital to defendant[ ], we feel ourselves at liberty to correct it." *Wiborg v. United States*, 163 U.S. 632, 658, 16 S.Ct. 1127, 41 L.Ed. 289 (1896); *cf. Hall v. United States*, 343 A.2d 35, 37 (D.C. 1975) ("[C]ourts of appeal, for good reason, are not disposed to notice alleged errors which are raised for the first time on appeal absent a clear showing of miscarriage of justice."). For the reasons that follow, we conclude that this is such a case.

1. *Was there Error?*

■ We turn to consider first the judge's instruction that "the absence of any fingerprint evidence, standing alone, does not constitute reasonable doubt as to the firearm charges." Appellant contends that the instruction was erroneous because it "fatally overstated the degree of doubt required under the reasonable doubt standard,"[6] and removed from the

6. The appellant submits four ways in which

the instruction misstated the reasonable doubt

jury's consideration evidence that had been introduced in the case: the absence of fingerprint evidence. The government advances a narrower reading of the instruction, one that emphasizes the phrase "standing alone," and suggests that "the court merely instructed that the jury's assessment of the evidence should not stop at the absence of fingerprint evidence: that the lack of fingerprint evidence does not, as a matter of law, mean that the jury must acquit."

At trial, the government relied on an incorrect interpretation of our holding in *Banks* as legal support for this instruction. In that case, we rejected the argument that the evidence was insufficient to support a CPWL conviction, even though no fingerprints were found on the handgun at issue, holding that the lack of fingerprint evidence had no effect because "the law is clear that the government is not required to negate all possible inferences of innocence before one can be found guilty of an offense beyond a reasonable doubt." 287 A.2d at 87. That the government is not required to introduce fingerprint evidence to present a legally sufficient case does not, however, logically lead to the conclusion that the jury is precluded from grounding reasonable doubt on the lack of such evidence in a particular case. In the course of discussing appellate review of the sufficiency of the evidence in *Banks*, we simply noted that the absence of fingerprints was not dispositive as a matter of law because the government's evidence "need not exclude every reasonable hypothesis consistent with innocence," *Bernard v. United States*, 575 A.2d 1191, 1194

(D.C.1990), nor compel a finding of guilt. *See Taylor v. United States*, 601 A.2d 1060, 1062 (D.C.1991). Delineating the proper scope of our review as to whether the evidence is sufficient to *permit* the jury to convict is a much different issue from whether the jury is to be instructed that the lack of fingerprint evidence is insufficient to constitute a reasonable doubt on the facts and circumstances of a particular case. The latter's impact is to *prohibit* the jury from acquitting on this basis.

We conclude that the jury instruction was erroneous, though the nature of the error lies somewhere in between the differing analyses provided by the parties. Contrary to appellant's reading of the instruction, the instruction allowed the jury to consider the lack of fingerprint evidence, *along with the other evidence* submitted for its consideration, and could factor it into its analysis of the case against him; and, contrary to the government's reading on appeal, the jury was told that it *could not* acquit if its doubt was based solely on the lack of fingerprint evidence.

■■■ It is axiomatic that one of the quintessential functions of a jury—and of each juror in a jury—is to independently consider the evidence and attach a relative weight to each item of evidence. While a judge enjoys the common law privilege to comment upon the evidence, *see Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), this privilege has "inherent limitations" and must be exercised cautiously, for a judge's influence "on the jury 'is necessarily and properly of

---

standard: (1) by forbidding jurors from "basing reasonable doubt on evidence they were legally entitled to consider—the lack of fingerprint evidence"; (2) by suggesting that the legal definition of "reasonable doubt" required more than doubt based on the lack of fingerprint evidence; (3) "by indicating that reasonable doubt could not be based on the lack of evidence so long as the government had no legal duty to produce such evidence"; and (4) "by informing the jurors that the government need not overcome all logically-derived and evidence-based inferences of innocence."

great weight' and 'his [or her] lightest word or intimation is received with deference, and may prove to be controlling.'" *Id.* at 470, 53 S.Ct. 698. Moreover, the judge may not exercise this privilege in a manner which intrudes upon functions which are within the sole province of the jury. *See Billeci v. United States,* 87 U.S.App. D.C. 274, 283, 184 F.2d 394, 403 (1950) ("The difference between assisting the jury, which is the duty of a federal judge, and encroaching upon its responsibilities, which is forbidden, has been developed at great length many times....."). We have long recognized that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of [the] judge." *Anderson v. Ford Motor Co.,* 682 A.2d 651, 654 (D.C.1996) (quoting *Fry v. Diamond Constr., Inc.,* 659 A.2d 241, 245 (D.C.1995)); *Feaster v. United States,* 631 A.2d 400, 408 (D.C.1993) ("It is for the jury to decide weight and credibility: neither the trial court nor the reviewing court can infringe upon that authority.") (internal quotations and citation marks omitted); 9 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2551 (Chadbourn rev. ed. 1981) ("When evidential data are once admitted by the judge and there is a sufficiency of them to entitle the case to go to the jury, their individual and total weight or probative value is for the decision of the jury."). Indeed, we have said, it is the "right of the jury" to make such determinations. *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987); *Morrison v. United States,* 417 A.2d 409, 413 (D.C.1980) ("It is a first principle that the jury, as finder of fact, has the function of determining the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences from proven facts.").

In determining whether an instruction is erroneous, we view the instructions given to the jury as a whole. *See Montgomery v. United States,* 384 A.2d 655, 661 (D.C. 1978). The trial judge properly gave the recommended reasonable doubt instruction, *see Smith,* 709 A.2d at 82, and the "function of the jury" instruction, which informed jurors that they were the "sole and exclusive" finders of fact, and encouraged the jurors to abide by their own convictions if they disagreed with the judge's assessment of the evidence. Even so, we do not believe that these instructions were sufficient to outweigh in the jurors' minds the instruction given here, which declared that the absence of fingerprint evidence tying appellant to the gun "does not constitute a reasonable doubt." The reasonable doubt and function of the jury instructions were given in the course of a number of other instructions and preceded the challenged instruction concerning the lack of fingerprint evidence, which did not refer back to the previous instructions or in any other way explain how its admonition concerning the lack of fingerprint evidence fit into the instructions previously given. Moreover, the "function of the jury" instruction was itself immediately preceded by the judge's clear assertion of its final authority on matters of law, saying that "it is your duty to accept the law as I state it to you.... You may not ignore any instruction or question the wisdom of any rule of law."[7] The judge's

7. The judge instructed:

> Again, my function is to conduct this trial in an orderly, fair and efficient manner, to rule on any questions of law that come up during the trial and to instruct you on the law which applies in this case. It is your duty to accept the law as I state it to you. You should consider all of the instructions as a whole. You may not ignore any instruction or question the wisdom of any rule of law.

emphatic instruction that the absence of fingerprint evidence in the government's case "does not constitute reasonable doubt" is likely to have been taken by the jury as a legal injunction ("the law as I state it to you") against basing acquittal on the absence of fingerprint evidence—an injunction that the jury had "a duty to accept" without "question[ing its] wisdom," rather than as referring to the "facts" as to which the jurors were the "sole and exclusive judges." *See Quercia,* 289 U.S. at 472, 53 S.Ct. 698 ("Nor do we think that the error was cured by the statement of the trial judge that his opinion of the evidence was not binding on the jury and that if they did not agree with it they should find the defendant not guilty. His definite and concrete assertion of fact, which he had made with all the persuasiveness of judicial utterance, as to the basis of his opinion, was not withdrawn. His characterization ... was of a sort most likely to remain firmly lodged in the memory of the jury...."). Because the instruction, viewed in context, was contrary to the elemental premise that a critical assessment of that evidence was for the jury, and not the judge, to make, we hold that it was erroneous, and that the first element of plain error review is satisfied. *See Olano,* 507 U.S. at 733–34, 113 S.Ct. 1770 ("If a legal rule was violated during the [trial] court proceedings, and if the defendant did not waive the rule, then there has been an 'error' within the meaning of Rule 52(b) despite the absence of a timely objection.").[8]

### 2. *Was the Error "Clear" or "Obvious"?*

For an error to be noticed under the plain error standard, it also must be "plain" as in " 'clear' or, equivalently, 'obvious.' " *Id.* at 734, 113 S.Ct. 1770. This requires a determination of whether the claimed error was clearly at odds with established and settled law. *See id.* ("At a minimum, a court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law."). As the foregoing discussion shows, the principle that it is solely for the jury to evaluate and weigh an item of evidence is one of long standing. It was a clear violation of this rule for the judge to issue jury instructions that identified an item of evidence and assigned to it a certain evidentiary weight. Accordingly, the second factor relevant to identifying plain error also is satisfied.

### 3. *Did the Error Affect Substantial Rights?*

The plain error must "affect substantial rights," meaning that viewed in the context of the trial, there is a reasonable probability that but for the error the "factfinder would have had a reasonable doubt respecting guilt." *Strickland v.*

Your function as the jury is to determine what the facts are in the case. You are the sole and exclusive judges of the facts. You decide the value of the evidence, as well as the believability of the witnesses. You should determine the facts without prejudice, fear, sympathy or favor. You should not be improperly influenced by anyone's race, ethnic origin or gender. Decide the case solely from a fair consideration of the evidence.

You may not take anything I may have said or done as indicating how I think you should decide this case. Again, if you believe that I have expressed or indicated any opinion as to the facts, you should disregard it. You, the jury, are the sole and exclusive judges of the facts.

8. As our reasoning makes clear, we express no view concerning the effect of similar instructions in a different contextual setting. Each case must be determined viewing the instructions actually given to the jury as a whole, including the sequence and manner in which they were presented.

*Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also United States v. Dominguez Benitez,* 542 U.S. 74, 81–82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (equating test for prejudice "affecting substantial rights" under plain error review with prejudice prong of *Strickland* and *Kotteakos* [*v. U.S.,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)] standard for harmless error review). There is "one important difference" between this inquiry, and the usual harmless-error analysis, *see, e.g., Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d .705 (1967)—under plain error review, "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Olano,* 507 U.S. at 734, 113 S.Ct. 1770.[9]

The erroneous instruction interfered with two foundational aspects of a criminal prosecution intended to protect the rights of the defendant: the right to a jury trial and the due process right to be convicted only if the state has proven guilt beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The full exercise of these rights is critical, particularly where the case presented was such as to raise a reasonable doubt in the mind of the jury. The government's investigation in this case was premised on an anonymous tip stating that an unidentified person in a red truck at a certain location had a gun. When the police responded to the location, they found appellant close to a red truck that he had been using. In the truck they found a firearm. On the scene, appellant initially disclaimed ownership of the vehicle and tried to flee; additionally, at the station house he provided a false name while he was being processed. The government presented *sufficient* evidence to convict because from these facts a jury reasonably could infer guilt beyond a reasonable doubt. *See Curington v. United States,* 621 A.2d 819, 824 (D.C.1993) (noting that judgment of acquittal is justified "only where there is no evidence upon which a reasonable [juror] could infer guilt beyond a reasonable doubt") (quoting *Head v. United States,* 451 A.2d 615, 622 (D.C. 1982)).

But, although it was sufficient to convict, the evidence was not overwhelming. While appellant had been using the truck in which the gun was found, he was not the owner, and he had given over access to and control over the truck to several employees of the carwash before the police arrived on the scene, any one of whom

---

**9.** Appellant maintains that the instruction so undermined the reasonable doubt standard that it should be considered structural error entitling him to reversal regardless of whether any prejudice inhered. The Supreme Court has identified a "limited class of cases" *(Joyce) Johnson,* 520 U.S. at 468, 117 S.Ct. 1544, which are considered "structural errors," *i.e.,* "defect[s] affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Among this limited class of errors is a jury instruction which misdescribes the reasonable doubt standard. *See Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328,

112 L.Ed.2d 339 (1990). We have held that jury instructions "which are unambiguously directed verdicts on an essential element of the crime" also entitle the defendant to *per se* reversal, *see Minor v. United States,* 475 A.2d 414, 416 (D.C.1984), but have declined to adopt this *per se* reversal standard for jury instructions which have the effect of shifting the burden of proof from the government to the accused. *See Henderson v. United States,* 527 A.2d 1262, 1264 (D.C.1987). For the reasons explained in the text, we conclude that appellant has met the burden of showing prejudice to substantial rights. We, therefore, decline to decide whether the error complained of here is structural in nature, as such a determination would have no effect on our resolution of the case.

could have placed the gun later found in the vehicle. Moreover, the officers testified that the gun was in plain view on the passenger seat of the vehicle where it obviously would have been noticed by these employees. But two of the carwash employees testified, however, that when they were in the truck, *i.e.*, immediately after the appellant had relinquished control of the vehicle, they did not see any firearm despite the fact that they had been inside the truck to drive it and clean it. Appellant also testified that he saw an unidentified employee of the carwash working in his truck in the minutes preceding the arrival of the police, and that this employee left the scene as the police arrived. Significantly, appellant explained that the truck, which was locked when the police arrived, had an automatic locking mechanism. Although the government's theory was that appellant had initially kept the gun with him when he first turned the truck over to the carwash employees, and then placed the gun in the truck when he saw the police car arrive at the carwash, the government offered no evidence to rebut appellant's testimony concerning the truck's automatic locking mechanism, nor did it attempt to explain the sequence of events by which appellant—who did not have the keys when he was detained by police [10]—would have been able to access the locked truck to dispose of the gun he presumably had been holding while the truck was going through the carwash. In this uncertain context, the lack of "hard evidence" such as fingerprints tying appellant to the firearm found in the truck, could have been critical in creating reasonable doubt in the minds of jurors.

Appellant could have argued, and the jury certainly would have been entitled to consider, the lack of fingerprint evidence in assessing whether the government had met its burden of proving appellant's guilt beyond a reasonable doubt. *See, e.g., Greer,* 697 A.2d at 1210–12 (reversing the conviction where the jury was instructed that it "should base its decision based on the evidence which has been presented and not on evidence that has not been presented," because "a reasonable doubt may arise from the evidence, or from a lack of evidence"); *United States v. Hoffman,* 296 U.S.App. D.C. 21, 24, 964 F.2d 21, 24 (1992) ("[T]he absence of [fingerprint] evidence is a relevant 'fact' which properly could have been argued to the jury."); *accord Hughes v. United States,* 633 A.2d 851, 852 (D.C.1993); *United States v. Poindexter,* 942 F.2d 354, 359–60 (6th Cir. 1991) (reversing conviction, after trial counsel was precluded from arguing to the jury that there was insufficient evidence that defendant handled a gun because of the absence of any fingerprints on the weapon; such an argument is permissible because, "in every criminal case, the mosaic of evidence that comprises the record before a jury includes both the evidence *and* the lack of evidence on material matters. Indeed, it is the absence of evidence upon such matters that may provide the reasonable doubt that moves a jury to acquit"); *United States v. Thompson,* 37 F.3d 450, 454 (9th Cir.1994) ("Because evidence comes in various forms, some stronger and some weaker, a defendant is entitled to argue to the jury that the government's failure to present a particular type of strong evidence against her—*e.g.,* fingerprints—weakens its case."); *see also Smith,* 709 A.2d at 82 (promulgating the standard instruction on reasonable doubt, and defining that concept as, *inter alia,* "a doubt for which you have a reason based upon the evidence or lack of evidence in the case").

10. Appellant's mother had to be summoned to bring her keys to unlock the truck.

We do not say that, had the jury been unimpaired in its consideration of the lack of fingerprint evidence, appellant would have been acquitted. But that high threshold is not required, even under plain error review. What is required—and what we find here—is that the identification of one piece of evidence which was probative of appellant's innocence in a case that presents sufficient, but not overwhelming evidence, and the erroneous instruction informing the jury that the exculpatory evidence was of such meager weight that it did not, "standing alone," constitute a reasonable doubt, undermines a reviewing court's confidence in the verdict rendered. *Cf. (Joyce) Johnson,* 520 U.S. at 470, 117 S.Ct. 1544 (even though judge invaded upon jury's fact-finding province, error was lacking in prejudice because the judge's instruction was with full and overwhelming support in the evidence).

4. *Did the Error Affect the "Fairness, Integrity or Reputation" of the Trial?*

■■■■ Having found the three elements of plain error—an error, which is obvious and affects substantial rights—we must now decide whether to exercise our discretion to correct that error by reversing appellant's conviction. "[A] plain error affecting substantial rights does not, without more, satisfy the *Atkinson* standard." *Olano,* 507 U.S. at 737, 113 S.Ct. 1770. Under that standard, a plain error entitles the appellant to a new trial only where it

"seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736, 113 S.Ct. 1770 (quoting *Atkinson,* 297 U.S. at 160, 56 S.Ct. 391). Mindful that such discretion should be exercised only in "particularly egregious" situations, *see Dixon,* 565 A.2d at 75 (quoting *Young,* 470 U.S. at 15, 105 S.Ct. 1038), we conclude that the error in this case affected the fundamental fairness and integrity of the jury trial, and as such, requires reversal.

The Constitution's guarantee of a jury trial is widely perceived as a hallmark of the fairness, integrity and public acceptance of judicial proceedings. Beyond serving an essential function in our system of criminal justice—ensuring that twelve independent minds, each with unique backgrounds, experiences and world views, are unanimous in their assessment of criminal guilt—the jury serves a fundamental purpose in our tripartite democracy. "Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely v. Washington,* 542 U.S. 296, 306, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).[11]

■■■■ Inherent in the right to trial by jury is the assumption that the jury will be allowed to weigh the evidence and determine criminal guilt without undue judicial intervention:

The accused has a right to a trial by the jury. That means that his guilt or inno-

---

11. The defendant's right to have guilt adjudicated by a jury has been fundamental to the Anglo–American scheme of justice since that right was demanded of King John I by the lords at Runnymede nearly eight centuries ago. The thirty-ninth clause of the Magna Carta provided: "No freeman shall be seized, or imprisoned, or dispossessed, or outlawed, or in any way destroyed; nor will we condemn him, nor will we commit him to prison, excepting by the legal judgment of his peers

or by the laws of the land." When the founders of this nation cataloged our civil rights and liberties, they provided for jury trials in both civil, U.S. CONST. amend. VII, and criminal trials. U.S. CONST. amend. VI. As the Supreme Court has confirmed, "trial by jury in criminal cases is fundamental to the American scheme of justice." *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

cence must be decided by twelve lay[persons] and not by the one judge. A judge cannot impinge upon that right any more than he can destroy it. He cannot press upon the jury the weight of his influence any more than he can eliminate the jury altogether.

*Billeci*, 87 U.S.App.D.C. at 283, 184 F.2d at 403. *See also Minor*, 475 A.2d at 416 ("Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts but so long as the functions of the judge and jury are distinct, the one responding to the law and the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury.") (quoting *Morissette v. United States*, 342 U.S. 246, 274, 72 S.Ct. 240, 96 L.Ed. 288 (1952)).

■ Judges "have no power to weigh the evidence or to pass upon the credibility of witnesses. That is the function of the jury." *V.E.M. Hotel Service, Inc. v. Uline, Inc.*, 190 A.2d 812, 813 (D.C.1963) (citing *Cope Ford, Inc. v. Lastfogel*, 184 A.2d 206 (D.C.1962)). When the trial court crosses the line of separation between its functions and those uniquely within the province of the jury, it diminishes the exercise of this fundamental right under our constitutional system. Given that this right is one of the cornerstones upon which our criminal justice system is balanced, when it is violated, or even diminished, the fairness, integrity or public reputation of that trial is called into question.

This is not to say that every judicial encroachment into the role of the jury will be an error of such magnitude as to require reversal. Sometimes a judge may step into the jury's province, but that error will not rise to this high level, because the evidence against the defendant remains overwhelming, and he or she is not prejudiced by the encroachment. *See (Joyce) Johnson*, 520 U.S. at 470, 117 S.Ct. 1544. As we have discussed, however, this is not such a case. In cases such as this, where the evidence requires careful weighing, the need for unfettered jury adjudication is at its zenith, and requires that each juror have considered all relevant evidence and be firmly convinced that there is no reasonable doubt as to the accused's guilt. When the court identifies one piece of evidence that favors the accused, and informs the jurors that it is only to be afforded minimal weight, the integrity of that jury trial is manifestly compromised.

We conclude that appellant has shown a plain error which justifies reversal on appeal. We therefore reverse the judgment of conviction with respect to the weapons charges—and remand the case to the trial court.[12]

*So ordered.*

---

12. The conviction for violating the Bail Reform Act is not affected by our holding and is therefore affirmed. *See* note 1, *supra*.